## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COREY PAGE #345030** | **CIVIL ACTION** |
| **versus** | **NO. 06-1577** |
| **BURL CAIN** | **SECTION: "N" (1)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Corey Page, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On September 20, 2001, he was convicted of ten counts of armed robbery in violation of La.Rev.Stat.Ann. §14:64 and one count of second degree kidnapping in violation of La.Rev.Stat.Ann. § 14:44.1.[2]  On November 29, 2001, he was found to be a habitual offender.  On that same date, he was sentenced on two counts of armed robbery to one hundred ninety-eight years imprisonment, on one count of armed robbery to one hundred seventy-five years imprisonment, on one count of armed robbery to one hundred sixty years imprisonment, on one count of armed robbery to one hundred fifty years imprisonment, on five counts of armed robbery to ninety-nine years imprisonment, and on the conviction for second degree kidnapping to forty years imprisonment.  It was ordered that his sentences be served without benefit of parole, probation, or suspension of sentence.[3]  On January 28, 2003, the Louisiana Fifth Circuit Court of Appeal affirmed all of petitioner's convictions.  Additionally, all of petitioner's sentences were affirmed except for the two sentences for one hundred ninety-eight years imprisonment.  Because those enhanced sentences were for convictions arising out of the same criminal episode, he could not be sentenced as a habitual offender on both convictions.  Accordingly, those two sentences were vacated, and the matter was remanded so that he could be resentenced on those two counts.[4]

---

[2]  State Rec., Vol. II of IV, transcript of September 20, 2001, pp. 189-90; State Rec., Vol. I of IV, minute entry dated September 20, 2001; State Rec., Vol. I of IV, jury verdict forms.

[3]  State Rec., Vol. II of IV, transcript of November 29, 2001; State Rec., Vol. I of IV, minute entry dated November 29, 2001.

[4]  State v. Page, 837 So.2d 165 (La. App. 5th Cir. 2003) (No. 02-KA-689); State Rec., Vol. III of IV.  The records relating to petitioner's resentencing do not appear to be included within the state court record furnished to his Court.  However, in its response, the state indicates that petitioner was

Petitioner then filed with the Louisiana Fifth Circuit Court of Appeal an application for rehearing and rehearing en banc.[5]  That application was refused on February 24, 2003.[6]  He then filed with the Louisiana Supreme Court an application for a writ of certiorari, prohibition, and mandamus[7] which was denied on November 7, 2003.[8]

On November 10, 2004, petitioner filed with the state district court an application for post-conviction relief.[9]  That application was denied on December 10, 2004.[10]  He next filed with the Louisiana Fifth Circuit Court of Appeal applications for supervisory writs which were denied

---

resentenced on one court to a term of ninety-nine years imprisonment and was given an enhanced sentence of one hundred ninety-eight years on the other count.  Rec. Doc. 10, p. 3 n.1.

[5] State Rec., Vol. II of IV.

[6] State Rec., Vol. IV of IV.

[7] State Rec., Vol. IV of IV.

[8] State v. Page, 857 So.2d 517 (La. 2003) (No. 2003-KO-0951); State Rec., Vol. IV of IV.

[9] State Rec., Vol. III of IV.

[10]  State Rec., Vol. III of IV, Order dated December 10, 2004.

on January 21, 2005,[11] and February 11, 2005.[12]  He then filed with the Louisiana Supreme Court

an application for a writ of certiorari[13] which was denied on February 3, 2006.[14]

       On February 16, 2006, petitioner filed this federal application for *habeas corpus*

relief.[15]  In support of his application, he raises the following claims:

      1.   The members of the sanity commission were unqualified and did

          not fully assess petitioner's competency;

      2.   The trial judge erred in failing to recuse himself; and

      3.   Petitioner received ineffective assistance of counsel.

       The state contends that petitioner's federal application is untimely.[16]   The

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a

petitioner bring his Section 2254 claims within one (1) year of the date on which his conviction or

---

[11]   State *ex rel.* Page v. Cain, No. 05-KH-69 (La. App. 5th Cir. Jan. 21, 2005) (unpublished); State Rec., Vol. III of IV.

[12]   State *ex rel.* Page v. Cain, No. 05-KH-135 (La. App. 5th Cir. Feb. 11, 2005) (unpublished); State Rec., Vol. III of IV.

[13]   State Rec., Vol. IV of IV.

[14]   State *ex rel.* Page v. State, 922 So.2d 1159 (La. 2006) (No. 2005-KH-0953); State Rec., Vol. IV of IV.

[15]   Rec. Doc. 3.

[16]   Rec. Doc. 10.

sentence becomes "final."  Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).[17]

As noted, on November 7, 2003, the Louisiana Supreme Court denied petitioner's writ application challenging the state intermediate appellate court's judgment affirming his convictions.  For AEDPA purposes, his convictions became "final" ninety (90) days later when his period expired for seeking a writ of certiorari from the United States Supreme Court.  See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999); Chester v. Cain, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); see also U.S. Sup. Ct. R. 13(1).  Accordingly, petitioner's one-year period for seeking federal *habeas corpus* relief commenced on February 5, 2004, and expired one year later unless that deadline was extended through tolling.[18]

---

[17]   Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are inapplicable in the instant case.

[18]   The state argues that the statute of limitations commenced earlier because petitioner's writ application was untimely filed with the Louisiana Supreme Court.  Although the state's contention may well have merit, the Court declines to accept the state's position for the following reasons.
    Louisiana Supreme Court Rule X, § 5(a) provides in pertinent part:

>       An application seeking to review a judgment of the court of appeal ... after an appeal to that court ... shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal; however, if a timely application for rehearing has been filed in the court of appeal in those instances where a rehearing is allowed, the application shall be made within thirty days of the mailing of the notice of denial of rehearing or the judgment on rehearing.

On January 28, 2003, the Louisiana Fifth Circuit Court of Appeal issued its judgment affirming petitioner's convictions.  An application for rehearing is allowed in such cases and must be filed within fourteen days.  Uniform Rules of the Louisiana Courts of Appeal Rules 2-18.2(a) and 2-18.7.  Although petitioner's rehearing application was date-stamped as filed February 14, 2003, it was

The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court. 28 U.S.C. § 2244(d)(2). Two hundred seventy-eight (278) days of petitioner's one-year statute of limitations elapsed prior to being tolled by the filing of his post-conviction application on November 10, 2004. Although that application was denied, tolling continued uninterrupted during the period of appellate review, so long as petitioner sought such review in a timely manner. See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004). The record does not establish that petitioner's related writ applications were untimely filed.[19] Accordingly, the Court finds that tolling continued until the Louisiana Supreme Court denied the related writ application on February 3, 2006.

---

signed and given to prison officials for mailing on February 11, 2003, within the fourteen-day period. See Rec. Doc. 11, pp. 1-2. It appears that petitioner must be given credit for the state "mailbox rule." See Causey v. Cain, 450 F.3d 601, 604-05 (5th Cir. 2006) (federal courts must apply the "mailbox rule" to Louisiana state court filings). Accordingly, this Court, out of an abundance of caution, will assume that the rehearing application was timely filed. Petitioner's rehearing application was then refused on February 24, 2003. State Rec., Vol. IV of IV. Petitioner's related writ application to the Louisiana Supreme Court was dated March 18, 2003, metered on March 19, 2003, and stamped as received by that court on March 20, 2003. State Rec., Vol. IV of IV. Accordingly, it must be considered to have been filed within thirty days of the denial of rehearing and, therefore was timely.

[19]  The state argues that petitioner's related writ application was untimely filed with the Louisiana Supreme Court. The record is inconclusive on that issue. The Louisiana Fifth Circuit Court of Appeal denied petitioner's writ application on February 11, 2005. State ex rel. Page v. Cain, No. 05-KH-135 (La. App. 5th Cir. Feb. 11, 2005) (unpublished); State Rec., Vol. III of IV. Petitioner then had thirty days to file his writ application with the Louisiana Supreme Court. Louisiana Supreme Court Rule X, § 5(a). Petitioner's cover letter accompanying his writ application was dated March 8, 2005, well within that thirty-day period. In light of the state's "mailbox rule," this Court will assume that the application was timely filed.

At that point, petitioner had eighty-seven (87) days remaining of his statute of limitations. Because he filed his federal application a mere thirteen days later on February 16, 2006,[20] the Court finds that it was timely filed. Further, because the state concedes that petitioner exhausted his state court remedies,[21] the Court will address the merits of his claims.

Standard of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides

---

[20] Petitioner signed his application February 16, 2006. Rec. Doc. 3. That date represents the earliest date that petitioner could have presented his application to prison officials for mailing and, therefore, the earliest date that this Court could deem his *habeas* petition to have been filed for statute of limitations purposes. Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).

[21] Rec. Doc. 10, p. 5.

a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeals summarized the facts of this case as follows:

The eleven count bill of information can be categorized into four separate incidents.

## THE INCIDENTS

### 1) Counts Six and Eleven

At approximately 2:00 a.m. on December 3, 1999, Walter Yrle was working at his computer repair shop, Computer Clinic, located on the Westbank Expressway, when the electricity went off. He packed up his laptop computer putting two deposit envelopes and the day's receipts inside and left the store. As he locked up the store, he noticed the lights were on in the shop next to his and suspected foul play. He walked straight to his car when a masked man came from the side of the building yelling, "Get down or I'll blow you away." Mr. Yrle testified the man approached in a crouched position

like a policeman moving with a weapon.  Something black was protruding from the man's left hand, which was covered with something red.  Mr. Yrle stated the man was holding the item like a policeman would hold a gun.  He believed the man was armed.  Mr. Yrle could only see the man's eyes and not his face.

Mr. Yrle was made to lay spread eagle in the parking lot.  The man put something in Mr. Yrle's back, told him not to move and took his car keys and laptop computer.  The man then ordered Mr. Yrle into the trunk of the car.  Mr. Yrle tried to resist but the man dragged him to the car, pushed him into the trunk and closed the trunk.  Mr. Yrle testified the car stopped twice.  At one point, the man asked Mr. Yrle for his ATM card but Mr. Yrle did not have one.  At the third and last stop, Mr. Yrle heard the man rifling through the back seat.  Mr. Yrle asked the man to leave his laptop to which the man agreed.  The man then unlocked the trunk and told Mr. Yrle to count to 20 before opening the trunk.  When Mr. Yrle got out of the trunk, he discovered he was on Downman Road in New Orleans East.  Approximately $6,000 was missing from his laptop case, which included both deposit envelopes and the cash from the day's receipts.

## 2) Counts One through Five

Between 6:00 p.m. and 8:00 p.m. on December 30, 1999, Andrew Hungerford was working at his computer store, PC Direct, on Lapalco when two men masked with bandannas and armed with guns entered the store.  The employees and customers were ordered to lie on the ground.  One man approached Mr. Hungerford with a gun in his left hand and asked where the money was.  Mr. Hungerford gave the man a tray of money containing between $300-$500.  The man then made Mr. Hungerford walk to the back of the store where the man took Mr. Hungerford's wallet.  Mr. Hungerford was forced to his knees and then put face down on the floor where his hands and feet were taped.

Two other people in the store, David Moreau and Willie Jordan, Sr., were also put face down on the floor at which time their hands were taped behind their backs and their feet were taped.  One man put a gun to the back of Mr. Moreau's neck and took his wallet which contained between $50-$75.  One man put a gun to Mr. Jordan's chin and took his wallet and cell phone.

Van Dixon and his girlfriend were also in the store but they were not taped.  One man put a gun to Mr. Dixon's neck and asked for money.  Mr. Dixon gave the man $5 and the remote for his alarm.

Also present in the store at the time of the robbery were Mr. Hungerford's three minor nephews, ages 14 and 15. M.D.[FN2], one of the teenagers, was approached by one man with a gun and told to empty his pockets.  He gave the man $5 and a food stamp from his wallet.

[FN2]   The victim's initials are used under the authority of LSA-R.S. 46:1844 which provides for the use of the initials of a crime victim who is a minor.

The two masked men left through the front door. The victims untaped each other and called the police.

### 3) Counts Seven and Eight

Sometime after 10:00 p.m. on December 31, 1999, Felicia Knight and Sherylyn Richardel were working at Domino's Pizza on Barataria.  Ms. Knight explained that the "carry out" usually closes at 10:00 p.m. but was kept opened because of the surrounding activity associated with New Year's Eve.  A man, later identified as the defendant, approached the door.  Ms. Knight "buzzed" him in because she thought he had ordered a pizza. As defendant opened the door, a second man wearing a bandanna on his face, ran into the store.  Defendant put a gun in her face and ordered her to open the safe. While Ms. Knight was complying, a customer entered the store. Ms. Knight was ordered to lie down on the floor while defendant told the customer the pizza was not ready and to come back later.  Ms. Knight then opened the safe and defendant took the money, approximately $300.

Meanwhile, the man with the bandanna ran to the back of the store where Ms. Richardel was located.  The man yelled, "down on the floor," at which time Ms. Richardel saw a gun.  She was taken to the front of the store and made to lie face down.  Ms. Richardel told the man she had money in her back left pocket, which he retrieved, along with her wallet in her right pocket.

The men then rifled through the office drawers before leaving the store through the back door.  The men told Ms. Knight and Ms. Richardel to wait five to ten minutes before moving.  Ms. Knight subsequently called the police on her cell phone.

**4) Counts Nine and Ten**

At approximately 10:30 p.m. on January 28, 2000, Peter and Gaynelle Hand returned to their home on Deerfield Road in Terrytown.[FN3]  Mr. Hand went inside while Mrs. Hand remained outside for a few minutes to straighten the car.  When Mrs. Hand entered the house, someone pushed her inside from behind.  She made several attempts to run outside but the person kept dragging her back inside the house by her arm.  Mr. Hand, a retired New Orleans policeman who was weak from receiving radiation treatment for lung cancer, began to fight with the perpetrator as Mrs. Hand continued her attempts to get out of the house.  The perpetrator was wearing a ski mask and was armed with a gun.

[FN3] Mr. Hand was deceased at the time of trial.

Eventually, Mr. and Mrs. Hand stopped resisting and were made to kneel on the floor.  Mr. Hand was bleeding from the head where he was hit with the gun.  The perpetrator took Mr. Hand's wallet, Mrs. Hand's purse and a pair of shoes that were in a Dillard's bag.

After the perpetrator left, Mr. Hand grabbed a gun and went outside.  He did not see anything and called the police.  A Rolex with diamonds and a broken face, later identified as belonging to defendant, was found on the floor of the Hands' home.

**THE INVESTIGATION**

Detective Scott Guillory investigated the armed robbery at PC Direct.  He traced several calls made on the stolen cell phone after the robbery to Terrence Ellis.  Detective Guillory interviewed Ellis who stated that he was picked up from work by defendant, Keenan Holmes, and Krystal Wilson on the night of December 30, 1999.  Ellis testified that defendant and Holmes stated they had just robbed some people at a computer store.  Ellis testified he did not see any money but stated defendant had a cell phone and Holmes had a gun and bandanna in the car.

Detective Guillory also interviewed Wilson, defendant's girlfriend at the time, whose statement was similar to Ellis' statement.  Detective Guillory then obtained an arrest warrant for defendant and Holmes.  Wilson also advised Detective Guillory that defendant told her of a robbery where he took $4,000 from a man, put him in the

trunk and drove him to the east.  Detective Guillory looked into the matter and discovered the incident had occurred on December 3, 1999.  He interviewed the victim, Mr. Yrle, and subsequently obtained an arrest warrant for defendant on that incident.  Wilson further advised Detective Guillory of the Domino's robbery but he directed her to Detective John Carroll who was investigating that robbery.

In his investigation of the Domino's pizza robbery, Detective Carroll obtained a description of one of the perpetrators from the victims.  He learned defendant was a suspect in a series of similar robberies.  Detective Carroll interviewed Wilson who advised she was present at the Domino's when it was robbed.  She explained she, defendant and a person identified only as "Little Mike" went to Domino's for pizza.  Wilson waited in the car while defendant and "Little Mike" went inside.  She did not see what happened inside but was given money upon defendant's return to the car.  Wilson stated defendant admitted robbing the Domino's the next day.

Detective Carroll prepared a photographic lineup containing defendant's photograph.  He showed the lineup to Ms. Knight who positively identified defendant as the person who robbed the Domino's on December 31, 1999.

Detective Carroll also investigated the Hand robbery.  He found a Rolex with diamonds at the scene of the Hand robbery and remembered Wilson stated defendant was in possession of two Rolex watches with diamonds.  He showed the Rolex to Wilson who stated the watch belonged to defendant.

Defendant was arrested on February 8, 2000.  The police went to defendant's home to execute the arrest warrant.  Defendant was found lying next to an abandoned car in the backyard.  He started to run but was caught and arrested.  A gun was found in the grass within reaching distance where defendant was initially lying.

At trial, Keenan Holmes, a co-defendant in the PC Direct robbery, testified that he and defendant robbed people in a computer store.  Holmes also stated defendant told him about a robbery defendant committed at another computer store where he kidnapped a man, stole money, put him in the trunk of the man's car and drove the man from the westbank to the eastbank.  Holmes further testified defendant told him about a robbery he committed at Domino's and another robbery he committed involving two old people where the man fought back.

Defendant testified in his defense.  He denied he had ever been to the Computer Clinic or PC Direct.  He denied going into

Domino's pizza on the night of the robbery.  He suggested Ms. Knight identified him as the perpetrator because she had seen his picture in the newspaper as a suspect in the pizza robbery.  Defendant further suggested Ellis testified against him because Ellis had a grudge against him.  He also stated Holmes and Wilson were coerced into testifying against him.  Defendant explained the discovery of his Rolex at the Hand residence by stating it had been stolen prior to the robberies in question.[22]

<u>Sanity Commission</u>

Petitioner's first claim is that the members of the sanity commission were unqualified and did not fully assess his competency.  In the last reasoned state court judgment addressing those claims, the state district court rejected the claims, holding:

Turning to assignment of error number one, the defendant alleges that the trial court erred by allowing into evidence during the Sanity Commission Hearing the following:

1) Dr. Anita Snow of the Sanity Commission testified to having been licensed to practice medicine in the state of Louisiana since 1996.

2) Dr. Dahlia Bower of the Sanity Commission testified that she completed her training qualifications to be a clinical psychologist in 2000.

3) Petitioner claims that because Dr. Snow and Dr. Bower did not testify that they have been in the "actual practice of medicine for no less than three consecutive years immediately preceding the appointment" (Art. 644A of Title XXI LCCP).

The defendant maintains that the trial court exceeded its discretion in finding that these doctors met the prerequisite qualifications of a duly constituted Sanity Commission.  Both Dr.

---

[22] <u>State v. Page</u>, 837 So.2d 165, 169-72 (La. App. 5th Cir. 2003) (No. 02-KA-689); State Rec., Vol. III of IV.

Snow and Dr. Bower met the prerequisite qualifications for the Sanity Commission as outlined in Art. 644A of Title XXI LCCP. During the Sanity Hearing held on June 28, 2001, testimony was introduced that Dr. Snow had been qualified as an expert in the field of forensic psychiatry approximately 25 times in Jefferson and Orleans Parish as well as the Eastern Division Federal Court. (See June 28, 2001 Transcript, pp. 4-5, and 7). The transcript also reflects that Dr. Bower had been previously qualified 7 times in the 24th Judicial District Court in Jefferson Parish as an expert in clinical psychology. (See June 28, 2001 Transcript, pp. 16-18). Both sides also stipulated that these two doctors were experts in their fields. Upon review, the defendant's claim is without merit.

In his second assignment of error, the defendant claims that the Sanity Commission was unable to apply the Bennett criteria to determine his competency to stand trial. The defendant further claims that the Sanity Commission's inability to assess the Bennett Criteria renders the finding of competency erroneous. He also concludes that because the Sanity Commission was unable to assess the Bennett criteria, the report was incomplete and the sanity proceedings in violation of petitioner's due process rights.

Upon review of the Sanity Hearing transcript, Dr. Snow testified that she examined the petitioner on 2 occasions. On the first occasion, petitioner was completely uncooperative and no assessment was made. At the second meeting, Dr. Snow testified that she did, in fact, use the Bennett factors to assess the petitioner and she summarized these criteria for the court. Dr. Snow further stated that the petitioner's responses to the Bennett criteria were an attempt to feign mental illness, and that he was competent to stand trial. (See June 28, 2001 Transcript, pp. 10-15). Upon review, the defendant's claim is without merit.[23]

---

[23] State Rec., Vol. III of IV, Order dated December 10, 2004.

The Louisiana Fifth Circuit Court of Appeal found "no error" in that ruling,[24] and the Louisiana Supreme Court denied the related writ application without assigning reasons.[25]

This Court notes that "[c]onstitutional due process requires that trial of an accused may be conducted only when he is legally competent." Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir. 1980). "State procedures must be adequate to insure the right to be tried while competent." Id.

In this case, petitioner does not argue that he was denied a competency hearing, and the record clearly reflects he was not. Moreover, he does not argue that Louisiana's procedures for determining competency, as set forth in La. Code Crim. P. art. 644 et seq., are inadequate. Rather, he argues that his particular competency hearing was inadequate because the experts appointed to his sanity commission did not have the qualifications mandated by Article 644.

This Court finds that petitioner is not entitled to relief with respect to that claim. As a preliminary matter, the Court notes that the state court found that the experts did in fact meet the qualification requirements, and petitioner has not established that they did not. Nevertheless, even if the qualification requirements were not strictly met, that would not be a basis for granting federal relief. A failure to strictly comply with Article 644 would be, at most, a violation of state law. Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice. 28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983). Moreover, it is clear that the expert qualifications mandated by Article

---

[24] State ex rel. Page v. Cain, No. 05-KH-135 (La. App. 5th Cir. Feb. 11, 2005) (unpublished); State Rec., Vol. III of IV.

[25] State ex rel. Page v. State, 922 So.2d 1159 (La. 2006) (No. 2005-KH-0953); State Rec., Vol. IV of IV.

644 are not constitutionally required.  On the contrary, the United States Fifth Circuit Court of

Appeal has noted:  "We have never suggested that a trial court lacks discretion to determine the

competency of an accused without the support of expert medical opinion.  Indeed, we have upheld

a competency determination that pitted lay evidence against contrary expert testimony."  Holmes

v. King, 709 F.2d 965, 968 (1983).

       Petitioner next claims that he was wrongly found competent to stand trial because

the Sanity Commission experts admitted that they were unable to assess his competency under

Louisiana's "Bennett criteria."[26]  As the state district court noted in its denial of this claim, petitioner

---

[26]  Petitioner's reference is to the Louisiana Supreme Court case of State v. Bennett, 345 So.2d
1129 (La. 1977), in which that court held:

> The decision as to a defendant's competency to stand trial should not turn
> solely upon whether he suffers from a mental disease or defect, but must be made
> with specific reference to the nature of the charge, the complexity of the case and the
> gravity of the decisions with which he is faced.  Appropriate considerations in
> determining whether the accused is fully aware of the nature of the proceedings
> include:  whether he understands the nature of the charge and can appreciate its
> seriousness; whether he understands what defenses are available; whether he can
> distinguish a guilty plea from a not guilty plea and understand the consequences of
> each; whether he has an awareness of his legal rights; and whether he understands
> the range of possible verdicts and the consequences of conviction.  Facts to consider
> in determining an accused's ability to assist in his defense include:  whether he is
> able to recall and relate facts pertaining to his actions and whereabouts at certain
> times; whether he is able to assist counsel in locating and examining relevant
> witnesses; whether he is able to maintain a consistent defense; whether he is able to
> listen to the testimony of witnesses and inform his lawyer of any distortions or
> misstatements; whether he has the ability to make simple decisions in response to
> well-explained alternatives; whether, if necessary to defense strategy, he is capable
> of testifying in his own defense; and to what extent, if any, his mental condition is
> apt to deteriorate under the stress of trial.

Id. at 1138 (citations omitted).

misrepresents what occurred.  The experts made clear in their testimony that an attempt was made

to use the <u>Bennett</u> criteria, but petitioner made that endeavor impossible by refusing to cooperate

and feigning mental illness.  Dr. Snow testified that during her first meeting with petitioner, he

refused to look at or speak to her.[27]  During her second meeting with him, her attempt to assess

petitioner under the <u>Bennett</u> criteria was thwarted by his unconvincing efforts to fake a mental

illness.  She testified:

> A.  Okay.  During the Bennett Criteria, we ask questions concerning
> whether he understood the charges against him, and he stated, "I ain't
> been placed in a charger on the wall."
> When asked why he was incarcerated, he stated, "I already
> told you they say I broke some intergalactical space laws." ...
>
> Q [prosecutor].  Did he seem to understand the proceedings against
> him?
>
> A.  He seemed not to.  However, it was our opinion that he was
> willfully feigning inability to understand most of what we talked
> about with him.
>
> Q.  And what was that based on?
>
> A.  We did several forms of testing him during our malingering – I
> mean, sorry, during our mental status examination.  He – well, just to
> start off with, his reported psychotic symptoms were not really
> consistent with symptoms that would be seen in somebody who had
> schizophrenia.  He didn't have any of the negative symptoms that is
> associated with that illness.  When somebody is, in fact, paranoid or
> hearing voices, they have a constricted affect, which means they
> appeared nervous or kind of closed in.  "Affect" refers to the outward
> appearance of emotion.  And he didn't have that.  He didn't appear
> to be distracted at any point in time by hearing voices.
> Some of the symptoms that he described, such as seeing
> ghosts in his room – for one thing, visual hallucinations are rarely

---

[27]  State Rec., Vol. I of IV, transcript of June 28, 2001, p. 8.

associated with schizophrenia.  More often visual hallucinations are associated with medical problems, such as alcohol withdrawal or delirium, and it's rare to have visual hallucinations in association with schizophrenia.

He said he saw hairy midgets in his cell that spoke to him regularly.  Basically, everything that we asked him concerning any type of psychiatric symptom he had, he said that people could hear his thoughts, that the television spoke specifically to him.

It would be extremely unusual, and a person with this type of severe psychotic illness would not have a history – would have an extensive psychiatric history.

Mr. Page has no psychiatric history.  He was never evaluated by a psychiatrist prior to these proceedings, that we were able to find out.

Q.   Based on your interviews with Mr. Page, do you have any conclusions for this court?

A.  Yes.  Mr. Page doesn't have any evidence of any type of mental illness.   He was exaggerating his inability to understand the proceedings against him, and he was feigning psychotic symptoms, and we diagnosed him with malingering.

Q.  And as to the Bennett Criteria?

A.  We were unable to assess the Bennett Criteria (Witness perusing documents) because he didn't cooperate.  We assessed the – let me correct myself:

We assessed the Bennett Criteria, but he gave illogical answers and said he didn't understand anything.

Q.  Did he therefore demonstrate the major [sic] of the Bennett Criteria or not?

A.  He did not demonstrate the majority of the Bennett Criteria; however, he did not show evidence of a mental disease or defect that would be the cause of his inability to demonstrate the Bennett Criteria.

Q. Is it your opinion, then, that he could stand trial?

- 18 -

      A.  It's my opinion that he doesn't have any mental illness that would prevent him from doing so.[28]

She further testified that petitioner feigned inability to recognize the "plus symbol" when she wrote "1 + 1" on a piece of paper or to identify and select the triangle when shown pictures of a circle, a square, and a triangle.[29]  She noted that the evidence reflected that when he was not being evaluated, he was observed by jail guards "interacting with other inmates in a normal manner, going out to the yard, watching television, doing normal activities."[30]

      Dr. Dahlia Bower testified similarly and shared Dr. Snow's opinion that petitioner was faking.[31]

      Based on the evidence presented at the hearing, the judge determined that petitioner was indeed feigning mental illness and that he was competent to stand trial.[32]  This Court is to accept the state court's evaluation of competency unless that evaluation is not fairly supported by the record.  Holmes v. King, 709 F.2d 965, 968 (1983).  Obviously, the record more than adequately supports the state court's evaluation.

      The record reflects that petitioner is a career criminal familiar with the workings of the criminal justice system, and the trial court concluded that petitioner attempted to avoid yet

---

[28]  State Rec., Vol. I of IV, transcript of June 28, 2001, pp. 9-12.

[29]  State Rec., Vol. I of IV, transcript of June 28, 2001, p. 13.

[30]  State Rec., Vol. I of IV, transcript of June 28, 2001, p. 14.

[31]  State Rec., Vol. I of IV, transcript of June 28, 2001, pp. 16-23.

[32]  State Rec., Vol. I of IV, transcript of June 28, 2001, p. 26.

another trip to prison by feigning mental illness.  However, his "performance" was woefully

unconvincing.  Moreover, once he was found to be competent to stand trial, he miraculously

"recovered" and was able to participate in his trial, including taking the stand to testify on his own

behalf.[33]  Simply put, petitioner's claim that he was incompetent to stand trial is nothing short of

ludicrous, and his claims that his rights were violated in the state competency proceedings should

be flatly rejected.

   Petitioner has failed to demonstrate that the state court's decision on his competency

claims was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States.  Applying the AEDPA's deferential

standard, this Court therefore rejects those claims.

<u>Recusal</u>

   Petitioner next claims that the trial judge erred in failing to recuse himself.  On direct

appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> [D]efendant alleges that the trial court erred in failing to recuse itself
> and appoint an ad hoc judge to hear the case.
>   Defendant filed a written motion to recuse on the basis he
> could not receive a fair and impartial trial because two of the victims
> were parents of Jefferson Parish Magistrate, Jeff Hand.  Defendant
> maintained any judge sitting in the Twenty-Fourth Judicial District
> Court would be "biased, prejudiced and personally interested in the
> outcome" of the matter.  He sought to have Judge Bodenheimer and
> any other judge in the Twenty-Fourth Judicial District Court recused
> from his case and sought the appointment of an ad hoc judge for all
> his proceedings.  He alternatively requested that an ad hoc judge hear
> his motion to recuse.

---

[33]  State Rec., Vol. II of IV, transcript of September 20, 2001, pp. 128-61.

No ad hoc judge was appointed to hear the motion to recuse. Rather, the motion was referred to another judge in the district, Judge Robert Pitre. At the hearing on the motion to recuse, no evidence was presented. Rather, defense counsel merely argued defendant could not receive an unbiased trial and would be prejudiced by the fact two of the victims were the parents of Jeff Hand, who was "very well known in this District." In denying the motion, Judge Pitre stated:

> I've gone over the recusal articles, there's nothing in the recusal articles that would fit this situation. I don't see any grounds, there's no showing of bias or prejudice, or any personal interest on the part of Jeff Hand. I'm going to deny the motion.

The State argues defendant failed to preserve his right to appeal this issue because he failed to contemporaneously object to the trial court's denial of his motion to recuse. The State cites LSA-C.Cr.P. art. 841 in support of its position. Article 841(B) specifically states, "The requirement of an objection shall not apply to the court's ruling on any written motion." Defendant's motion to recuse was in writing and, therefore, the contemporaneous objection rule is not applicable.

LSA-C.Cr.P. art. 671(A) provides:

(A) In a criminal case a judge of any court, trial or appellate, shall be recused when he:

> (1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;

> (2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to

the district attorney, or to the spouse
of either, within the second degree;

(3) Has been employed or consulted as
an attorney in the cause, or has been
associated with an attorney during the
latter's employment in the cause;

(4) Is a witness in the cause;

(5) Has performed a judicial act in the
case in another court; or

(6) Would be unable, for any reason,
to conduct a fair and impartial trial.

These grounds are exclusive, not illustrative.  In re Lemoine,
96-0-2116 (La. 1/14/97), 686 So.2d 837, 843, on reh'g, 96-0-2116
(La. 4/4/97), 692 So.2d 358.  The party desiring to recuse a trial
judge shall file a written motion assigning the ground for recusal.
LSA-C.Cr.P. art. 674.  If a valid ground for recusal is set forth in the
motion for recusal, the judge shall either recuse himself, or, in a court
having two or more judges, as is the case in the instant matter, refer
the motion to another judge of that court.  LSA-C.Cr.P. arts. 674 and
675.

A trial judge is presumed to be impartial.  In order to obtain
a recusal based on bias, prejudice, and personal interest, the party
seeking the recusal must establish more than conclusory allegations.
State v. Davis, 00-1753 (La.App. 5 Cir. 4/24/01), 786 So.2d 834, 843.
In State v. Parker, 96-1852 (La.App. 4 Cir. 6/18/97), 696 So.2d 599,
607, writ denied, 97-1953 (La.1/9/98), 705 So.2d 1097, the Fourth
Circuit held that a recusal is not required simply on the basis the trial
judge knew the victim's family.  In Parker, it was established the trial
judge knew the victim's nephew.  The court stated that defendant had
produced no evidence to support the allegations that the trial judge
was bias or prejudiced.

Likewise, in the present case, defendant offered no evidence
of Judge Bodenheimer's bias or prejudice.  At the hearing on the
motion to recuse, defendant merely made a broad conclusory
statement:

> I filed a motion for a recusal, based on the fact that one of the victims – actually, two of the victims in one of the armed robberies that Mr. Page is charged with, were the parents of Mr. Jeff Hand, and my client feels that he cannot receive an unbiased trial, he would be prejudiced by the fact that Mr. Hand is very well known in this District.

> Defendant did not even allege that Judge Bodenheimer knew Jeff Hand.  There is nothing in the record to support defendant's allegations that Judge Bodenheimer or any other judge in the Twenty-Fourth Judicial District Court was biased or prejudiced.  Therefore, we find no error in the denial of defendant's motion to recuse.[34]

The Louisiana Supreme Court rejected the related writ application without assigning reasons.[35]

When petitioner reasserted this claim in his post-conviction proceedings, it was again rejected.  The state district court held:

> [T]he defendant alleges that his right to a fair tribunal was violated because his case was heard by Judge Ronald Bodenheimer who was later convicted of mail fraud, conspiring to commit mail fraud and conspiring to distribute Oxycontin.  The defendant also alleges that Judge Bodenheimer should have recused himself because he had dined with the two of the victims in petitioner's case on a previous occasion and knew the victim's son.  In his Motion by letter filed November 22, 2004, the defendant attaches two exhibits dealing with newspaper articles regarding various federal investigations regarding Judge Bodenheimer.  The defendant has not presented this Court with any further evidence and/or facts to prove that Judge Bodenheimer acted with bias or prejudice in defendant's case.  Further, this same issue was previously addressed and denied by the Louisiana Fifth Circuit Court of Appeal, No. 00-1782.  The Fifth Circuit found nothing in the record to support defendant's allegations that Judge Bodenheimer or any other judge of the 24th JDC was bias or prejudice [sic].  The Fifth Circuit found no error in the denial of the defendant's

---

[34]  <u>State v. Page</u>, 837 So.2d at 180-82; State Rec., Vol. III of IV.

[35]  <u>State v. Page</u>, 857 So.2d 517 (La. 2003) (No. 2003-KO-0951); State Rec., Vol. IV of IV.

motion to recuse.   This claim is denied as repetitive and *res judicata*.[36]

The Louisiana Fifth Circuit Court of Appeal found "no error" in that ruling,[37] and the Louisiana Supreme Court denied the related writ application without assigning reasons.[38]

The United States Fifth Circuit Court of Appeals has noted:

> [T]he cornerstone of the American judicial system is the right to a fair and impartial process.  Therefore, any judicial officer incapable of presiding in such a manner violates the due process rights of the party who suffers the resulting effects of that judicial officer's bias.

Bigby v. Dretke, 402 F.3d 551, 558 (5th Cir.), cert. denied, 126 S.Ct. 239 (2005).  However, it  is ordinarily presumed that judicial officers have properly discharged their official duties without bias or partiality.  Id.  Therefore, the burden is on the petitioner to establish that a "genuine question" exists concerning the judge's impartiality.  Id. at 559.

Petitioner has failed to established that any such genuine issue exists in this case. Although subsequent events have established that Ronald Bodenheimer, the trial judge in the instant case, was indeed corrupt, there is no evidence whatsoever that his corruption encompassed any of his actions in *this* case or that he performed his duties with respect to petitioner's trial with any bias or partiality.  Moreover, judicial bias cannot be inferred from the mere fact that Judge Bodenheimer

---

[36]  State Rec., Vol. III of IV, Order dated December 10, 2004.

[37]  State ex rel. Page v. Cain, No. 05-KH-135 (La. App. 5th Cir. Feb. 11, 2005) (unpublished); State Rec., Vol. III of IV.

[38]  State ex rel. Page v. State, 922 So.2d 1159 (La. 2006) (No. 2005-KH-0953); State Rec., Vol. IV of IV.

knew two of the victims and their son.  See United States v. Pankey, Nos. 88-5045 and 88-6197, 1989 WL 78939, at *7 (6th Cir. July 18, 1989) (unpublished).

Petitioner has failed to demonstrate that the state court's decision on his claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Applying the AEDPA's deferential standard, this Court therefore rejects that claim.

Ineffective Assistance of Counsel

Petitioner claims that he received ineffective assistance of counsel.  In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. See id. at 697.  If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong.  Id.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).

Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide

range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986);

Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

       In order to prove prejudice with respect to trial counsel, petitioner "must show that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable

probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a

determination as to whether prejudice occurred, courts must review the record to determine "the

relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d

at 793.

       A claim of ineffective assistance of counsel is a mixed question of law and fact.

Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Therefore, this Court must defer to the state

court on such claims unless the state court's decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United

States."  28 U.S.C. § 2254(d)(1).

       In the last reasoned state court judgment addressing that claim, the state district court

reject the claim, holding:

> [P]etitioner claims that he was denied the right to effective assistance
> of counsel.  The Supreme Court of the United States established the
> standards for the claim of ineffective assistance of counsel in
> Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d
> 674 (1984).  The test established by the Supreme Court provides that
> in order for a claim of ineffective assistance of counsel to prevail, the

petitioner must show the counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and that the deficient performance prejudiced the defense in that the errors were so serious as to deprive petitioner of a fair trial.

The Louisiana Supreme Court addressed this very issue in State v. Strahan, 325 So.2d 231 (La. 1975).

> "Further, failure of trial counsel to adequately question alibi witnesses, properly investigate the case, make an opening statement, have defendant take the stand, request particular special charges, and object to certain questions asked of witnesses at trial are all claimed to clearly show that defendant was not adequately and effectively represented at the trial. We do not agree. These charges are either leveled at decisions made by counsel during the heat of trial, the correctness of which cannot be determined by hindsight, or the validity of which is not evident from the record." Id. at 233.

The petitioner claims that his attorney did not conduct proper pre-trial investigations because he failed to interview alleged alibis [sic] witnesses and/or the co-defendant. A review of the record reveals that defense counsel filed numerous pre-trial motions. She represented and litigated the defendant's Motion for Sanity Commission regarding his competency to stand trial. The defense also cross-examined the trial witnesses and defendant was able to testify on his behalf. According to Strahan and under the Strickland test, the petitioner's claim must be dismissed for failure of the defendant to meet the two-prong test. The defendant's claim are essentially with his counsel's trial tactics.[39]

---

[39]  State Rec., Vol. III of IV, Order dated December 10, 2004.

- 27 -

The Louisiana Fifth Circuit Court of Appeal found "no error" in that ruling,[40] and the Louisiana Supreme Court denied the related writ application without assigning reasons.[41]

Petitioner argues that counsel was ineffective in failing to (1) investigate petitioner's alibi and potential alibi witnesses, (2) interview eyewitnesses, and (3) interview his co-defendant. Petitioner has failed to meet his burden to demonstrate that any of these claims have merit.

To the extent that petitioner is contending that counsel failed to perform an adequate investigation into his "alibi," his claim falls woefully short. A petitioner asserting a claim for inadequate investigation bears the burden to provide factual support for his allegations as to what further investigation would have revealed. Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998). He has provided no factual support for his contention that he had any viable alibi. Moreover, in light of the overwhelming evidence presented at trial establishing his guilt, this Court has no hesitation in finding that petitioner was not prejudiced by any failure of counsel to perform a more thorough investigation in the instant case.

To the extent that petitioner is contending that counsel should have interviewed other witnesses and called them to testify, his claim is similarly deficient. "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) (citing Sayre v. Anderson, 238 F.3d 631, 635-36 (5th Cir. 2001)). To show the prejudice required

---

[40] State ex rel. Page v. Cain, No. 05-KH-135 (La. App. 5th Cir. Feb. 11, 2005) (unpublished); State Rec., Vol. III of IV.

[41] State ex rel. Page v. State, 922 So.2d 1159 (La. 2006) (No. 2005-KH-0953); State Rec., Vol. IV of IV.

to support an ineffective assistance claim premised on the failure to call a witness, a petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" Evans, 285 F.3d at 377 (quoting Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985)).  Petitioner furnished neither the state court nor this Court any evidence in support of his bald assertions regarding the proposed witnesses.  Petitioner has not provided affidavits from them or any other corroboration that they would have testified in a manner consistent with petitioner's version of the facts or, for that matter, that they would have testified at trial at all. Petitioner has, therefore, failed to establish either that counsel's performance was deficient or that prejudice resulted from the failure to interview or call the proposed witnesses to testify.

Lastly, to the extent that petitioner is contending that counsel was ineffective in failing interview the co-defendant and to more vigorously cross-examine him regarding his prior statement, the claim likewise has no merit.  Contrary to petitioner's suggestion otherwise, counsel's cross-examination of Holmes indicates that she was in fact familiar with his prior statement.[42] Moreover, "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." Ford v. Cockrell, 315 F.Supp.2d 831, 859 (W.D. Tex. 2004), aff'd, 135 Fed. App'x 769 (5th Cir. 2005), cert. denied, 125 S.Ct. 1026 (2006).  The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.

---

[42] See State Rec., Vol. II of IV, transcript of September 20, 2001, pp. 26-27.

Strickland, 466 U.S. at 689.  In the instant case, defense counsel in fact vigorously cross-examined Holmes on several issues, specifically including his prior statement.[43]  This Court cannot say that counsel's cross-examination was so deficient as to violate petitioner's constitutional rights, and petitioner certainly has not shown that he was prejudiced by the fact some questions went unasked.

In the instant case, the state court correctly identified the appropriate legal standard, i.e. the Strickland standard, in analyzing petitioner's ineffective assistance of counsel claim. Moreover, petitioner has failed to demonstrate that the state court's decision on his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Applying the AEDPA's deferential standard, this Court therefore rejects that claim.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Corey Page be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

---

[43]  See State Rec., Vol. II of IV, transcript of September 20, 2001, pp. 24-31.

New Orleans, Louisiana, this eleventh day of September, 2006.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**